<u>**NOT FOR PUBLICATION**</u>                              [Dkt. Ents. 174, 178, 180]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

---

|  |  |  |
|---|---|---|
| MYZEL FRIERSON, | : | |
| | : | |
| Plaintiff, | : | Civil No. 07-3857 (RMB/KMW) |
| | : | |
| v. | : | |
| | : | **OPINION** |
| ST. FRANCIS MEDICAL CENTER, | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

<u>APPEARANCES</u>

William M. Tambussi, Esq.
Brian Patrick Faulk, Esq.
Eric D. Milavsky, Esq.
Brown & Connery, LLP
360 Haddon Avenue
P.O. Box 539
Westmont, New Jersey 08108
    Counsel for Plaintiff

Franklin Lewis Flacks, Esq.
Rottkamp & Flacks, Esqs.
795 Parkway Avenue
Suite A-6, Lexington Mews
Trenton, New Jersey 08618
    Counsel for Defendant St. Francis Medical Center

Colleen Leigh Brandt, Esq.
Sean X. Kelly, Esq.
Marks, O'Neill, O'Brien & Courtney, PC
Cooper River West, Suite 300
6981 North Park Drive
Pennsauken, New Jersey 08109
    Counsel for Defendants Correctional Medical Services, Inc.,
Fran Green, Stephen Hoey, Charmaine Ifill, & Maurice Rosman

**BUMB,** UNITED STATES DISTRICT JUDGE:

In this civil rights action, plaintiff Myzel Frierson ("Plaintiff") claims that while incarcerated in the New Jersey state penal system between 2003 and 2007, the defendants provided him with inadequate medical treatment in violation of his Eighth Amendment rights.  Specifically, he alleges that he was misdiagnosed with Systemic Lupus Erythematosus ("SLE" or "Lupus") and improperly treated with steroid medication, which caused severe damage to his joints.  He claims that his requests to be retested for Lupus were denied, that he was not advised of the side effects of the steroids, and that his pain medication was suspended during a two-week period.

Currently before the Court are three motions.  The first two are motions for summary judgment: one by defendant St. Francis Medical Center ("St. Francis") [Dkt. Ent. 178], and the other by defendants Correctional Medical Services, Inc., and its employees Fran Green, Stephen Hoey, Charmaine Ifill, and Maurice Rosman (collectively, "the CMS Defendants") [Dkt. Ent. 180].  The third motion was filed by Plaintiff, requesting that this Court re-enter a prior Order dismissing certain defendants from this case in order for him to file a timely appeal.[1]  [Dkt. Ent. 174.]  For the following reasons, the Court grants both motions for summary

---

[1] Although Plaintiff is represented by <u>pro</u> <u>bono</u> counsel, he filed this motion <u>pro</u> <u>se</u>.

judgment and denies Plaintiff's motion to re-enter a prior Order.

## I. BACKGROUND[2]

Plaintiff was incarcerated in the New Jersey penal system from 2002 to 2008.  He was housed at South Woods State Prison in Bridgeton, New Jersey, from 2002 until 2005, Northern State Prison in Newark, New Jersey, from 2005 until 2007, Riverfront State Prison in Camden, New Jersey, from 2007 until the beginning of 2008, and South Woods State prison again from the beginning of 2008 until his release on December 8, 2008.

Plaintiff filed this action on August 14, 2007, pursuant to 42 U.S.C. § 1983.  He seeks redress for injuries he allegedly sustained as a result of his treatment by St. Francis and the CMS Defendants.  He claims that they acted with deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights.  The relevant facts are as follows.

**Plaintiff's Lupus Diagnosis and Treatment with Prednisone**

On December 18, 2002, after suffering a high fever, muscle pain, joint pain and swollen hands, Plaintiff was sent from South Woods State Prison to St. Francis Medical Center.  St. Francis is a private medical center that contracted with the New Jersey

---

[2] The background facts are generally drawn from the parties' Rule 56.1 Statements of Material Fact and are construed in the light most favorable to Plaintiff.  See Kopec v. Tate, 361 F.3d 772, 775 (3d Cir. 2004).  The Court notes that the parties originally filed summary judgment motions and oppositions without proper Rule 56.1 Statements.  This Court, therefore, permitted the parties to file renewed motions in compliance with the Local Rules, and the Court now considers these subsequently-filed submissions. [Dkt. Ent. 177.]

Department of Corrections to provide medical services to New Jersey inmates during the relevant time period. (Pl.'s Opp. to CMS, Ex. H; Pl.'s Statement of Disputed Material Facts ("SDMF") to St. Francis ¶ 5.) At St. Francis, several medical specialists treated Plaintiff. He was ultimately diagnosed with autoimmune hepatitis and SLE[1] and started on a course of steroids, which included the drug prednisone. (St. Francis Statement of Undisputed Material Facts ("SUMF") ¶ 4; Pl.'s SDMF to St. Francis ¶¶ 8-9; Second Am. Compl. ¶ 17(b).) Plaintiff claims he asked to be retested for Lupus at St. Francis, but this request was denied. (St. Francis SUMF ¶ 7.) St. Francis discharged him on January 3, 2003, and transferred him back to South Woods. (Id. at ¶ 3.) St. Francis did not provide any follow-up care to Plaintiff with respect to his Lupus. (Pl.'s SDMF to St. Francis ¶ 15.)

The long-term use of prednisone can cause avascular necrosis, which is the reduction of blood supply to the end of long bones, causing the death of bone tissue. (Pl.'s SDMF to St. Francis ¶¶ 11-12 (citing Hoey Dep. Tr. 22:15-20, Pl.'s Ex. G)). It is unclear from the record how common this side effect is. Plaintiff claims St. Francis did not disclose this risk to him. (Pl.'s SDMF to St. Francis ¶ 15; Pl.'s Dep. Tr. 79:5-13, Oct. 18,

---

[1] SLE is "an inflammatory connective tissue disease with variable features, frequently including fever, weakness and fatigability, joint pains or arthritis resembling rheumatoid arthritis, [and] diffuse erythematous skin lesions on the face, neck, or upper extremities . . . ." Stedman's Medical Dictionary 1124 (28th ed. 2006).

2010, Pl.'s Ex. C.)  He concedes, however, that rheumatologists Juliet Coquia and Gerald F. Falasca of the University of Medicine & Dentistry of New Jersey informed him of the risk of organ and joint damage associated with prednisone in a March 2003 consult. (Pl.'s Dep. 80:19-81:3, Oct. 18, 2010, Pl.'s Ex. C.)

These rheumatologists were hired by the Department of Corrections to conduct a medical evaluation of Plaintiff on March 11, 2003, approximately two months after Plaintiff's discharge from St. Francis.  (Coquia & Falasca Letter to Dr. Hoey, Mar. 11, 2003, CMS Ex. B.)  Doctors Coquia and Falasca (the "Rheumatologists") reported the following impression of Plaintiff to defendant Dr. Hoey at CMS:

> Mr. Frierson's history of polyarthritis, positive ANA,[2] lymphopenia and pleurisy is consistent with lupus or a lupus like syndrome. However, he may also have a[n] acute HIV or hepatitis and should be tested for that.

(Id.)  It is unclear from the record whether Plaintiff was subsequently tested for HIV or hepatitis, as the Rheumatologists recommended.  However, Plaintiff's medical records from St. Francis indicate that an infectious disease specialist conducted testing during his January 2003 hospitalization and subsequently ruled out HIV. (Discharge Summary, Pl.'s Opp. to St. Francis, Ex. E.)  It also appears that Plaintiff had already been diagnosed

---

[2] "ANA" stands for "antinuclear antibodies", which are "found in the serum of a high proportion of patients with systemic lupus erythematosus, rheumatoid arthritis, and certain collagen diseases, and in some of their healthy relatives; as well as about 1% of otherwise healthy people."  Stedman's Medical Dictionary 103.

with autoimmune hepatitis.  (Second Am. Compl. ¶ 17(b).)

The Second Amended Complaint (the "Complaint") alleges that the Rheumatologists recommended taking Plaintiff off the steroids "immediately." (Compl. ¶ 17(j-k).)  Plaintiff now concedes, however, that the Rheumatologists actually recommended gradually tapering his dosage of prednisone from 20 milligrams three times per day to 20 milligrams once per day.  (CMS' SUMF ¶ 3; Pl.'s Resp. to CMS' SUMF ¶ 3.)  Plaintiff also admits that he was subsequently given prednisone in the reduced dosage and frequency as recommended by the Rheumatologists.  (Pl.'s Resp. to CMS' SUMF ¶ 4.)

The Rheumatologists' March 11th letter to Dr. Hoey recommended a follow-up in two months.[3]  Plaintiff's electronic medical records indicate that Plaintiff had a rheumatology appointment scheduled for May 27, 2003, approximately two months after the March 11th visit, but it was rescheduled because Plaintiff had scheduled lumbar spinal surgery on May 23, 2003. (CMS' Reply Ex. A at 966.)  Plaintiff's rheumatology appointment was rescheduled for August 21, 2003, but was cancelled by "Central Trans." without any explanation in his medical records. (CMS' Reply Ex. D at 894.)  There is no evidence that any of the individual CMS Defendants were responsible for this cancellation.

---

[3] The Complaint alleges, without any support, that the defendants "ignored the [Rheumatologists'] recommendation for follow up."  (Compl. ¶ 17(l)).  Notably, this allegation was omitted by Plaintiff in his Rule 56.1 Statement of Facts and opposition papers, and, in any case, is not supported by the record.  The Court thus deems this unsupported allegation conceded.

The appointment was again rescheduled for November 20, 2003.
Plaintiff cancelled this appointment because he did not want to
attend it due to the fact that the previous appointment had been
cancelled.[4]

The parties dispute how long Plaintiff was treated with
prednisone.  The CMS Defendants' medical expert stated that
Plaintiff was given prednisone for eight months starting in
January 2003.  (CMS Defs. Ex. I at 6.)  He notes that the
prednisone was properly tapered and discontinued as soon as
possible.  (Id. at 7.)  Plaintiff testified that he took
prednisone up until August or September of 2009.  (Pl.'s SDMF to
St. Francis ¶ 17.)  The Court notes that this means Plaintiff
took prednisone long after he knew of the risks of the drug, had
been diagnosed with avascular necrosis, and had filed the
operative Complaint.

Plaintiff repeatedly requested a new Lupus test in January
2003, from Dr. Hoey and Nurse Green, but those requests were
denied.  (Compl. ¶ 17(e); Pl.'s Dep. Tr. 60:7-20, Pl.'s Ex. B to
CMS.)  In March 2003, he again asked for retesting after he
received information from the National Lupus Foundation, which
indicated that it is extremely rare for an African American male

---

[4] CMS requested Plaintiff's consent for the November 20th rheumatology
appointment with Dr. Falasca.  Plaintiff signed a form entitled "Consent for
Medical, Dental, or Surgical Treatment" on November 13, 2003, indicating that
he "do[es] not consent to the recommended treatment."  He explained, "I was to
see them before but [it] was canceled."  (CMS' Reply Ex. H.)  An "occurrence
form" also reflects that Plaintiff cancelled his November 20th rheumatology
appointment; it states: "[Plaintiff] says he was scheduled to see them before,

to contract Lupus.[5]  (Compl. ¶ 17(g); Pl.'s Dep. Tr. 60:7-20, Pl.'s Ex. B to CMS.)  Nurse Kilpatrick informed him that the test would have to be ordered by Dr. Rosman, yet Dr. Rosman did not order the test.  (Id.)  Plaintiff conceded that he only made verbal requests to be retested for Lupus and did not file any type of inmate request or grievance form to this effect.  (Pl.'s Dep. Tr. 60:3-24, Pl.'s Ex. B.)

Plaintiff claims that as a consequence of taking prednisone, he experienced steroid acne, and, more significantly, avascular necrosis.  (Pl.'s SDMF to CMS ¶ 18.)  Plaintiff has not, however, averred that Rosman or Hoey failed to inform him of these side effects.[6]

During an orthopedic consultation on December 8, 2005, Dr. John Godinsky formally diagnosed Plaintiff with avascular necrosis.[7]  (Pl's SDMF to CMS ¶ 19.)  Dr. Godinsky recommended

---

but it was cancelled + so he doesn't want to go this time."  (Id.)

[5] The CMS Defendants' medical expert cited to medical literature on this topic, which shows that there is actually an "increased frequency of systemic lupus in Afro-American patients with a 3 to 1 predilection versus white patients." (CMS Ex. I at 7.)  He also noted a "predilection of women to men in a 9 to 1 ratio." (Id.)

[6] Although Plaintiff's statement of material disputed facts represents that Doctors Hoey and Rosman failed to warn him of prednisone's side effects, it is important to note that the portion of Plaintiff's deposition transcript on which Plaintiff relies for this fact only states that nurse practitioner Lisa Renee Kuntz failed to inform him of these side effects.  (Pl's Suppl. SDMF ¶ 17; Pl's Dep. Tr. 66:2-14, Oct. 22, 2010, Pl.'s Ex. B.)  Moreover, Plaintiff admits that the Rheumatologists advised him of the risk of organ and joint damage associated with prednisone in March 2003 (Pl.'s Dep. 80:19-81:20, Oct. 18, 2010, Pl.'s Ex. C to CMS), but that despite this warning, he continued to take prednisone up until August or September of 2009 (Pl.'s Dep. 81:16-20, Oct. 18, 2010, Pl.'s Ex. B to St. Francis).

[7] The Complaint alleges that Dr. Rosman denied Plaintiff diagnostic testing in November and December 2004, and that CMS failed to provide Plaintiff's x-ray and MRI for his orthopedic consults, thus making these appointments useless.  (Compl. ¶¶ 17(m, v).)  It appears Plaintiff has abandoned this portion of his

that Plaintiff get x-rays of his shoulder for further evaluation, but advised that he would most likely need a total shoulder replacement.  (CMS' SUMF ¶ 20; Pl.'s Medical Records, CMS Ex. D at 461.)  Plaintiff's medical records on December 9, 2005, indicate that he refused to have an x-ray performed on his shoulder.  (CMS Ex. D at 461.)  Plaintiff returned on February 24, 2006, complaining of left shoulder pain.  The physician's assistant prescribed Percocet and noted that Plaintiff's left shoulder replacement was being scheduled.  (CMS' SUMF ¶ 21; CMS Ex. D at 440.)  On March 17, 2006, Plaintiff was given an

---

claims, since he failed to support or even address them in his opposition papers and Rule 56.1 Statement of Facts.  Accordingly, the Court does not consider these allegations.  Moreover, the parties agree that between 2004 and 2005, Plaintiff was treated repeatedly for shoulder pain.  Dr. Rosman diagnosed Plaintiff with tendonitis in December 2004, and injected his shoulder with depomedro and xylocaine.  (CMS' SUMF ¶ 7.)  Later that month, Dr. Hoey ordered an x-ray of Plaintiff's left shoulder, which revealed "sclerosis & lucency in the head of the humerus consistent with old fx." (CMS' SUMF ¶¶ 9-10.)  In January 2005, Nurse Green discussed the x-ray results with Plaintiff and recommended physical therapy.  Plaintiff returned later that month, and Dr. Hoey saw him and ordered physical therapy and lab work. (CMS' SUMF ¶ 12.)  Plaintiff received physical therapy and was seen by Dr. Hoey again on March 16, 2005, at which time Dr. Hoey diagnosed a possible rotator cuff tear of the left shoulder.  (CMS' SUMF ¶ 13.)  He ordered an MRI of the left shoulder to rule out a rotator cuff tear and avascular necrosis of the humeral head.  He also discontinued the previously ordered Darvocet (which had been prescribed for back pain) and prescribed Tylenol and Codeine.  (Id.) Dr. Hoey saw Plaintiff again on March 23, 2005 with regard to his left shoulder pain.  The MRI was still pending but Dr. Hoey ordered Neurontin as it was his impression that there was a component of neuralgia.  (Id. at ¶ 14.) The MRI was performed on or about April 27, 2005, and showed "avascular necrosis of the humeral head associated with subcortical fractures and humeral head collapse."  (Id. at ¶ 15.)  The next day, Plaintiff was admitted to the infirmary for evaluation and management of his pain.  The previously prescribed Neurontin and Motrin were discontinued and Plaintiff was prescribed Tylenol with Codeine #3, Ultram, and Motrin.  (Id. at ¶ 16.)  That same day, Dr. Hoey ordered an orthopedic consult to evaluate Plaintiff with regard to the MRI findings.  (Id. at ¶ 17.)  Plaintiff was a no-show for the orthopedic consult scheduled for June 27, 2005.  (Id. at ¶ 18.)  On October 28, 2005, Plaintiff was sent to an orthopedic consult but was sent back without being seen, although his prescription for Tylenol with Codeine was renewed.  The record does not reflect why he was not seen, but instructs the consult coordinator "to get new date asap."  (Id. at ¶ 19; CMS Ex. D at 477.) Plaintiff was seen for his orthopedic consultation on December 8, 2005, when

injection to his left shoulder for his pain.  (CMS' SUMF ¶ 22.)
During an orthopedic consultation on May 4, 2006, Plaintiff
advised Dr. Godinsky that he did not want the recommended left
shoulder replacement surgery.  Dr. Godinsky told him that he
could have the surgery at any time if he changed his mind.  (CMS'
SUMF ¶ 23; CMS Ex. D at 404.)  On May 16, 2006, Plaintiff saw Dr.
Godinsky again and advised him that he refused the recommended
left shoulder replacement surgery because he wanted a better
surgeon.  (CMS' SUMF ¶ 24.)[8]

In August 2006, Plaintiff was retested for Lupus.  The test
came back negative for autoimmune diseases.  (Pl.'s SDMF to CMS ¶
24; Pl.'s Medical Records, CMS Ex. D at 359.)  Plaintiff believes
he never had Lupus and that his doctor at St. Francis
misdiagnosed him in 2003, because Lupus is very rare among men
and because the mental health medications he was taking during
his initial diagnosis may have produced a false positive result.
(Pl.'s Dep. Tr. 65:11-66:25, Pl.'s Ex. C.)  The CMS Defendants
dispute this.  They contend that Plaintiff was appropriately
diagnosed with SLE and that the two subsequent negative tests do

---

Dr. Godinsky diagnosed him with avascular necrosis.  (Id. at ¶ 20.)
[8] At this May 16th appointment, Plaintiff also complained of hip pain and
requested to be seen by a rheumatologist for management of his Lupus.  (CMS'
SUMF ¶ 24.)  Plaintiff subsequently had a rheumatology consult scheduled for
July 26, 2006, but he refused to attend the appointment.  (Id. at ¶ 25; Pl.'s
Resp. to CMS' SUMF ¶ 25.)  Notably, the Complaint alleges that "[b]etween
January and May of 2007, plaintiff sought referrals to a pain specialist and
for a referral to a Rheumatologist but was denied said treatment.  Dr.
Hochberg refused to treat Plaintiff."  (Compl. ¶ 17(t).)  Since Plaintiff has
made no mention of this allegation in his opposition papers or Rule 56.1
Statement of Facts and has failed to point to any support for it in the
record, it appears Plaintiff has abandoned this claim.  Moreover, it appears

not alter his diagnosis.[9]  (CMS Defs.' Reply at 6-7.)  They rely

on an expert report from a rheumatologist for support.[10]  (CMS

Defs.' Reply Ex. F.)  This rheumatologist, Dr. Mark Fisher,

asserts that while the medical literature is very clear about the

association between the use of steroids and avascular necrosis,

it also demonstrates an association between systemic lupus and

the development of avascular necrosis beyond the use of steroids

alone.  (Id. at 7.)  Thus, his report suggests that Plaintiff's

avascular necrosis was caused by his Lupus and not the

prednisone.

Plaintiff contends that his avascular necrosis caused him to

endure severe pain and to require serious narcotic pain

medications.  (Pl.'s SDMF ¶ 20.)  Additionally, Plaintiff asserts

that this condition severely deteriorated his hip and shoulder

joints, and that he now requires total hip and shoulder

replacements.  (Id. at ¶ 21.)  Plaintiff concedes, however, that

he refused the shoulder replacement surgery that his orthopedist

recommended in 2006.  (CMS' SUMF ¶¶ 23-24; Pl.'s Resp. to CMS'

---

to be alleged against Dr. Hochberg, who is not a defendant in this action.
[9] The record is unclear as to when the second negative test was performed.
[10] Dr. Hoey also testified that prednisone could mask Lupus and cause a
negative test result:
    Q: [A] blood test would still show that the person, a different type of
    blood test would still show that the person has lupus?
    A: It normally would, yes.
    Q: Normally it would?
    A: Yes.
    Q: Okay.
    A: But if your test is negative, that doesn't mean it is negative
    because if you're on Prednisone, Prednisone can eliminate the
    inflammatory response.  Therefore, you have no autoantibodies because
    the Prednisone is working so well.

SUMF ¶¶ 23-24.)

## Plaintiff's Pain Medications

Additionally, Plaintiff alleges that there was a two-week period from May 22 to June 5, 2007, when he did not receive pain medication despite being in significant pain from his avascular necrosis.[11]  (Pl.'s SDMF to CMS ¶ 25.)  Plaintiff alleges that defendant Nurse Charmaine Ifill discontinued his medication in contravention of doctor's orders.  (Id.; Pl.'s Dep. Tr. 33:23-35:19, Pl.'s Ex. B.)  Specifically, he claims that she "told those in charge to stop [his] pain medication," (Pl.'s Dep. Tr. 33:23-34:2, Pl.'s Ex. B), which they subsequently did.  (Pl.'s SDMF to CMS ¶ 28.)  The CMS Defendants dispute this.  Ifill testified that she did not have the authority to make a determination as to whether or not an inmate would receive medication because that determination was the doctors' to make. (Ifill Dep. Tr. 46:1-11, Pl.'s Ex. M.)  Plaintiff's electronic medical records do not reflect that Ifill was involved in Plaintiff's treatment during this time period.  (CMS Reply Ex. E.)  These records show that Plaintiff made two office visits during this period – the first to Doctor John Hochberg at

---

(Hoey Dep. Tr. 97:22-98:10, St. Francis Ex. G.)
[11] Plaintiff initially testified that he was denied pain medication from April through June 2005.  Defendants confronted him with his medication record, and Plaintiff acknowledged that it demonstrated that he was in fact given pain medication.  (CMS' SUMF ¶ 27; Pl.'s Response to CMS' SUMF ¶ 27.)  The Complaint also alleges that Dr. Rosman discontinued Plaintiff's pain medication "during 2005 and 2005 [sic]" and that Nurse Ifill refused to treat Plaintiff in September 2006.  (Compl. ¶¶ 17(r-s).)  Since Plaintiff has failed to address or support these claims in any way, the Court deems them abandoned.

Northern State Prison on May 23, 2007, and the second to Nurse
D'Ondra Bynum at Riverfront State Prison, on June 4, 2007,
neither of whom are defendants in this action.  (Id.)  During the
May 23rd visit, Dr. Hochberg noted that while Plaintiff had left
shoulder avascular necrosis, he was refusing joint replacement
surgery.  (Id. at 114.)  His notes also express concern that
Plaintiff may have a substance abuse problem and recommends a
psychiatric evaluation.  Nevertheless, Dr. Hochberg prescribed
Toradol (also known as ketorolac tromethamine) to treat
Plaintiff's left shoulder pain and recommended that Plaintiff
return for a follow-up appointment.[12]  (Id.)  Plaintiff's
appointment on June 4th occurred after his transfer to Riverfront
State Prison.  This visit was a "nurse transfer admission
assessment" in which Plaintiff was instructed on how to access
medical, dental, and psychiatric help as needed.  (Id. at 110-
112.)

## II. LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  A fact is "material" if it will "affect the outcome of
the suit under the governing law . . . ."  Anderson v. Liberty

---

[12] Toradol is a non-steroidal, anti-inflammatory drug used for the short-term
management of "moderately severe acute pain."  Toradol Drug Description,
RxList: The Internet Drug Index, http://www.rxlist.com/toradol-drug.htm (last
visited Aug. 2, 2011).

Lobby, Inc., 477 U.S. 242, 250 (1986).  A dispute is "genuine" if
it could lead a "reasonable jury [to] return a verdict for the
nonmoving party."  Id. at 250.  When deciding the existence of a
genuine dispute of material fact, a court's role is not to weigh
the evidence: all reasonable "inferences, doubts, and issues of
credibility should be resolved against the moving party."  Meyer
v. Riegel Products Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).
However, "a mere scintilla of evidence," without more, will not
give rise to a genuine dispute for trial.  Anderson, 477 U.S. at
249.  In the face of such evidence, summary judgment is still
appropriate "where the record . . . could not lead a rational
trier of fact to find for the nonmoving party . . . ."
Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S.
574, 586-587 (1986).  "Summary judgment motions thus require
judges to 'assess how one-sided evidence is, or what a 'fair-
minded' jury could 'reasonably' decide.'"  Williams v. Borough of
West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989) (quoting
Anderson, 477 U.S. at 265).  The movant "always bears the initial
responsibility of informing the district court of the basis for
its motion, and identifying those portions of 'the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any,' which it believes
demonstrate the absence of a genuine issue of material fact."
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed.

14

R. Civ. P. 56(c)).  Then, "when a properly supported motion for
summary judgment [has been] made, the adverse party 'must set
forth specific facts showing that there is a genuine issue for
trial.'"  Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P.
56(e)).  The non-movant's burden is rigorous: it "must point to
concrete evidence in the record"; mere allegations, conclusions,
conjecture, and speculation will not defeat summary judgment.
Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir.
1995); see Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010),
cert. den'd, 131 S. Ct. 458 (2010) ("[S]peculation and conjecture
may not defeat summary judgment.") (citing Acumed LLC v. Advanced
Surgical Servs., 561 F.3d 199, 228 (3d Cir. 2009)).

### III. DISCUSSION

The gravamen of the Complaint is that the CMS Defendants
violated Plaintiff's Eighth Amendment rights by denying his
requests to be retested for Lupus in January and March 2003,
failing to advise him of the side effects of prednisone prior to
his rheumatology consult in March 2003, and suspending his pain
medication during a two-week period in 2007.  (Pl.'s Opp. Br.
15.)  Plaintiff claims that St. Francis failed to warn him of the
potential side effects of prolonged treatment with prednisone and
also failed to monitor his progress on prednisone after his
discharge.  (Compl. ¶¶ 28, 30.)

The CMS Defendants and St. Francis both move for summary

judgment on the grounds that: (1) there are no genuine disputes of material fact, and the evidence in the record is insufficient to establish that their treatment of Plaintiff amounted to deliberate indifference to his serious medical needs, (2) the statute of limitations bars Plaintiff's claims, and (3) they cannot be held liable under § 1983 upon a theory of respondeat superior.   The CMS Defendants additionally argue that (1) Plaintiff's claims against CMS and the individual CMS Defendants in their official capacities must be dismissed given the absence of a policy, practice, or custom of deliberate indifference, and (2) Plaintiff has failed to exhaust the administrative remedies available to him as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. 1997e(a).[13]

The Court turns first to the issue of administrative exhaustion, which is a threshold matter.

### A.    Administrative Exhaustion

The CMS Defendants argue that Plaintiff failed to exhaust all of the administrative remedies available to him prior to filing suit in violation of the PLRA.   The PLRA provides:

No action shall be brought with respect to prison

---

[13] The CMS Defendants and St. Francis also argue that any medical malpractice claims must be dismissed because Plaintiff has failed to supply an affidavit of merit as required by New Jersey law.   Plaintiff responds, correctly, that this argument is irrelevant, because the Complaint only alleges civil rights violations pursuant to 42 U.S.C. § 1983, not state law torts.   The CMS Defendants also argue that Plaintiff's claim for punitive damages must be dismissed because Plaintiff has failed to produce any evidence that the CMS Defendants' conduct was malicious, willful, or wanton.   The Court need not reach this issue, since it grants the CMS Defendants' motion for summary judgment on other grounds.

16

> conditions under section 1983 of this title, or any
> other Federal law, by a prisoner confined in any jail,
> prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. 1997e(a).  "[A]ctions arising under this clause relate

to the environment in which prisoners live, the physical

conditions of that environment, and the nature of the services

provided therein."  <u>Booth v. Churner</u>, 206 F.3d 289, 294 (3d Cir.

2000), <u>aff'd</u>, 532 U.S. 731 (2001).  Since Plaintiff's allegations

against CMS concern his medical treatment during his

incarceration, his claims go to the nature of services provided

to him, and he was thus required to exhaust his administrative

remedies before bringing this action.[14]  The failure to exhaust

is an affirmative defense to be pleaded and proved by the

defendant.  <u>See</u> <u>Ray v. Kertes</u>, 285 F.3d 287, 295 (3d Cir. 2002).

 A prisoner has not exhausted his administrative remedies for

---

[14] The language of the PLRA – "[n]o action shall be brought . . . under
section 1983 of this title . . . until such administrative remedies as are
available are exhausted" – cannot reasonably be read to exempt complaints
about medical treatment merely because such treatment was provided by private
medical service providers.  <u>Baker v. Allen</u>, Civ. Action No. 03-2600, 2006 WL
2226351, *6 (D.N.J. Aug. 3, 2006).  Such private contractors, like CMS, are
generally considered state actors under § 1983.  <u>See</u> <u>West v. Atkins</u>, 487 U.S.
42, 54 (1988) (holding that a physician is considered a state actor when the
physician is under contract to provide medical services to prisoners); <u>Christy
v. Robinson</u>, 216 F. Supp. 2d 398, 412 n.26 (D.N.J. 2002) (finding CMS to have
been a state actor for purposes of prisoner's § 1983 claims).  Moreover,
courts within this Circuit have held that the PLRA's exhaustion requirement
applies to claims against CMS.  <u>See</u>, <u>e.g.</u>, <u>Baker</u>, 2006 WL 2226351, *6 (finding
that the PLRA applies to prisoner's § 1983 claims against CMS); <u>Frink v.
Williams</u>, Civ. Action No. 04-026, 2005 WL 2346891, *2 (D. Del. 2005)
(dismissing prisoner's claim that CMS failed to provide him adequate medical
care given failure to exhaust administrative remedies); <u>Baker v. Williams</u>,
Civ. Action No. 01-471, 2002 WL 31015630, *3 (D. Del. Sep. 10, 2002) (applying
§ 1997e(a) analysis to prisoner's claims against CMS). The Court is thus
satisfied that Plaintiff was bound by the PLRA's exhaustion requirement.
Notably, Plaintiff does not dispute this.  He does, however, contend that he
was not required to file an appeal with respect to his complaints about CMS.
(Pl.'s Opp. Br. 18.)  The Court addresses this argument <u>infra</u>.

PLRA purposes until he has pursued a grievance through each stage of appeal available within the prison system, even if the administrative remedy may be ineffective. See Spruill v. Gillis, 372 F.3d 218, 232 (3d Cir. 2004); Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000); Worthy v. Dep't of Corrs., No. 05-cv-751, 2006 WL 2376916 at *3 (D.N.J. Aug. 16, 2006). Accordingly, the prisoner must comply with all institutional grievance procedures set forth in the prison's inmate handbook before filing suit in federal court. Concepcion v. Morton, 306 F.3d 1347, 1348-49 (3d Cir. 2002) ("[T]he PLRA's exhaustion requirement applies to a grievance procedure described in an inmate handbook . . . .").

During Plaintiff's incarceration at South Woods (where he was treated by Doctors Rosman, Hoey, and Nurse Green), he was required to exhaust a four-step inmate grievance and tracking program and then file a complaint with the Office of the Corrections Ombudsman to address any outstanding concerns or complaints. (South Woods State Prison Inmate Handbook ("Inmate Handbook"), CMS Ex. H 96-98.) Although the CMS Defendants have not included an Inmate Handbook for Northern State Prison, where Plaintiff was incarcerated during his treatment by Nurse Ifill, Plaintiff has submitted numerous grievances, many of which were filed during his stay at Northern State from 2005 until June of 2007. The record thus makes clear that Northern State also had in place a grievance procedure available to Plaintiff.

Plaintiff concedes that he did not file any grievances regarding his claim that Hoey, Rosman, and Green denied his requests to be retested for Lupus.  See, supra, Part I; Pl.'s Dep. Tr. 60:7-24, Pl.'s Ex. B to CMS.  A review of his grievances (Pl.'s Ex. N) reflects that he also never filed any type of grievance regarding his remaining claims – i.e., that Hoey and Rosman failed to inform him of the side effects of prednisone or that Ifill denied him pain medication.  Instead, Plaintiff has submitted 29 grievances concerning unrelated matters, such as his request for a pillow, a thicker mattress, special boots to mitigate his back pain, etc.

The CMS Defendants contend that even if Plaintiff did file an initial grievance (the first step of the four-step grievance program), he was seen following each of these requests, and his concerns were addressed.  They argue that Plaintiff never filed any appeal with regard to the outcome of these initial requests and thus he did not exhaust all levels of appeal available to him within the grievance procedure.  Plaintiff responds with the vague assertion that he filed numerous administrative complaints and wrote to the Ombudsman about the inadequacies of his medical care.[15]  Notably, however, he does not claim to have filed grievances concerning his specific allegations in this case or

---

[15]   The Court notes, however, that Plaintiff has only submitted administrative complaints and an un-addressed letter, dated December 3, 2006, (Pl.'s Ex. N), not any complaints addressed to the Office of the Corrections Ombudsman.

that he exhausted the appeals process available to him prior to writing to the Ombudsman.  Instead, he argues that the CMS Defendants do not provide any evidence that Plaintiff was given a copy of the Inmate Handbook or that this Handbook actually exists.  However, he never asserts that he did *not* receive a copy of the Inmate Handbook.  The Court finds Plaintiff's arguments unpersuasive.  The CMS Defendants did, in fact, attach a copy of the Inmate Handbook to its moving papers (CMS Ex. H at 96-98).  They also contend that it is standard practice to give each inmate a copy of the Inmate Handbook upon incarceration.  (CMS Defs.' Reply Br. 24.)  Even if Plaintiff did not receive the Handbook, this fact is immaterial, because he filed 29 grievances - at South Woods and Northern State - so he was clearly aware of the grievance procedure available to him and able to use it.  See, e.g., Meanor v. Wilcox, 241 Fed. Appx. 856, 858 (3d Cir. 2007) (finding that prisoner was required to exhaust his administrative remedies where he was aware of grievance procedures, even though he had not received inmate handbook); Iles v. Deparlos, Civ. Action No. 09-1166, 2011 WL 861712, *3 (M.D. Pa. Mar. 9, 2011) (same).

Plaintiff further contends that the testimony of CMS' Second in Command of Operations, Margaret Amodei, creates a genuine issue of material fact as to whether he was required to appeal his grievances about CMS, because Amodei testified that: "The

Department of Corrections had an appeal process.  But CMS had nothing to do with it." (Pl.'s Opp. Br. 18 (citing Amodei Dep. Tr. 30:17-22, Pl.'s Ex. F).)  Plaintiff takes Amodei's statement out of context.  A review of her deposition testimony makes clear that she did not state or imply that grievances concerning medical treatment are exempt from the appeals process at South Woods.  Rather, she merely explains that CMS responds to the initial grievances related to medical treatment, and the Department of Corrections handles the appeals of such grievances.[16]  In fact, the Inmate Handbook clearly contemplates that the four-step grievance procedure encompasses claims regarding medical issues.  The Handbook expressly provides the "response times" for grievances and notes that "Medical/Dental/Mental Health problems/concerns" will be responded to within 7 calendar days.  (Inmate Handbook, CMS Defs.' Ex. H at 96.)

Putting aside the issue of whether Plaintiff filed the

---

[16] Amodei testified in relevant part:

> **Q.** [S]ay, for instance, the inmate didn't like the result of a grievance, was there an appeal process?
> **A.** The Department of Corrections had an appeal process.  But CMS had nothing to do with it.
> **Q.** So if they didn't like the answer of . . . whoever was responding to that complaint, . . . they would have to then go to the Department of Corrections?
> **A.** They wouldn't have to.  They could try to resolve it before doing that administrative remedy, they called it in the department, it was an appeal.  It is called an administrative remedy.  And that was the Department of Corrections, not even a medical Department of Corrections, it was the Department of Corrections policy for all grievances.  Not just medical.  It was, you know, classification, custody, whatever it was, it was their system.

(Amodei Dep. Tr. 30:17-31:12; CMS Defs.' Reply Ex. J.)

requisite appeals, the Court stresses that he did not file any grievances with respect to the claims at issue here.  It is clear that these claims therefore fail under the PLRA.  Even if Plaintiff had properly exhausted his administrative remedies, however, the Court notes that most of his claims would be barred by the statute of limitations.

**B.   Statute of Limitations**

The parties agree that the relevant statute of limitations period for these § 1983 claims is two years.  See Wilson v. Garcia, 471 U.S. 261 (1985), superseded by statute on other grounds, 28 U.S.C. § 1658(a) (holding that the state-law tort period controls § 1983 actions); N.J.S.A. § 2A:14-2 (setting the applicable period at two years).  It appears Plaintiff concedes that the particular allegations against the CMS Defendants occurred more than two years before the lawsuit was filed (on August 14, 2007).  Plaintiff relies instead upon the "continuing violations doctrine," which operates as an "equitable exception to the timely filing requirement."  See West v. Philadelphia Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995).  Under this doctrine, the statute of limitations is preserved if the defendant's last act evidencing a continuing practice falls within the limitations period.  See Sameric Corp. of Del. Inc. v. City of Philadelphia, 142 F.3d 582, 599 (3d Cir. 1998).

For the doctrine to apply, the defendant's conduct must have

been "more than the occurrence of isolated or sporadic acts."

West, 45 F.3d at 755 (quotations omitted).  The Third Circuit has

instructed that in deciding whether to apply the doctrine, courts

should consider: subject-matter, frequency, and degree of

permanence.  The factors are explained as follows:

> (1) subject matter -- whether the violations constitute
> the same type of discrimination, tending to connect
> them in a continuing violation; (2) frequency --
> whether the acts are recurring or more in the nature of
> isolated incidents; and (3) degree of permanence --
> whether the act had a degree of permanence which should
> trigger the plaintiff's awareness of and duty to assert
> his/her rights and whether the consequences of the act
> would continue even in the absence of a continuing
> intent to discriminate.  The consideration of "degree
> of permanence" is the most important of the factors.

Cowell v. Palmer Tp., 263 F.3d 286, 292 (3d Cir. 2001) (internal

citations omitted).

Plaintiff argues that the CMS Defendants' failure to retest

him for Lupus, advise him of the side effects of prednisone, and

provide him with pain medication constitute a continuing

violation.  (Pl.'s Opp. Br. 15.)  He contends that the Cowell

factors all weigh in his favor, because (1) the CMS Defendants'

conduct was all of the same type, i.e., each instance of

unconstitutional conduct by the CMS Defendants pertained to CMS's

treatment (or lack thereof) of Plaintiff's Lupus and his symptoms

from the medication prescribed to treat Lupus; (2) these

constitutional violations were not merely isolated acts, but

committed by a range of medical practitioners with such frequency

that they were a part of Plaintiff's daily life; and (3) the CMS Defendants' continuing violation did not trigger any degree of permanence until 2006, when Plaintiff tested negative for autoimmune diseases, and "the full picture of the CMS Defendants' policy or custom of deliberate indifference and the resultant harm materialized." (Pl's Opp. Br. 15-16.)

The Court finds this analysis unpersuasive. Despite Plaintiff's attempt to link these acts by characterizing them generally as treatment of his Lupus and related pain, the Court must consider the actual claims to determine whether they were sufficiently frequent and connected. Plaintiff's first claim alleges that defendants Hoey, Rosman, and Green denied his requests to be retested for Lupus in January and March of 2003. See, supra, Part I. This claim is clearly time-barred absent a finding of a continuing violation, since it occurred more than four years prior to the filing of this suit in August 2007.

Plaintiff's second claim is that Doctors Hoey and Rosman failed to inform him of the potential side effects associated with prednisone. Notably, this claim does not appear in the Complaint. Nor has Plaintiff testified to this.[17] In any event, this violation would have occurred prior to March 2003, when the Rheumatologists advised Plaintiff of the potential risks of

---

[17] Plaintiff's deposition testimony only alleges that Nurse Practitioner Lisa Renee Kuntz failed to warn him of the potential adverse effects of prednisone. (Pl's Dep. Tr. 66:2-14, Oct. 22, 2010, Pl.'s Ex. B.)

24

taking prednisone.  <u>See</u>, <u>supra</u>, Part I.[18]  Accordingly, this claim is also time-barred absent a finding of a continuing violation.

Plaintiff's third claim is the only one that falls within the two-year statute of limitations.  Plaintiff conceded all of his claims alleging denial of pain medication except this one: that defendant Ifill induced Plaintiff's doctor to stop giving him pain medication during a two-week period in May and June of 2007.  <u>See</u>, <u>supra,</u> Part I.  Putting aside the dubious merits of this claim, which will be discussed <u>infra</u>, the Court applies the <u>Cowell</u> test to determine whether this last act sufficiently connects with the time-barred claims to constitute a continuing violation.

First, with regard to "subject matter," the earlier claims appear to be unrelated to the later claim for denial of pain medication.  In fact, the later claim is the only allegation that Plaintiff was denied pain medication, since Plaintiff conceded

---

[18] Plaintiff testified as follows:
> Q. [D]id anyone that you saw in rheumatology consult in March of 2003 discuss with you the adverse effects of the medications you were being prescribed?
> A. Yes.
> Q. And what were you told?
> A. She told me that Prednisone damages organs, joints and Plaquenil damages your eyes.  And I need to be careful with that she said.
> Q. Okay.  So what adverse effects of the drugs that you were taking were you not aware of then that you're saying that CMS or anyone at CMS should have told you about?
> A. The damage to the joints, the organs and the eyes.
> Q. Okay.  But you were told that by the rheumatologist, correct?
> A. Correct.
> Q. Okay.  So had you the information with regard to the adverse effects?
> A. This was after taking the medication.
(Pl.'s Dep. Tr. 80:20-81:15, Oct. 18, 2010, Pl.'s Ex. C.)

his other similar claims.  See, supra, Part I.  It is also the
only claim against Ifill.  Further, Plaintiff has failed to
establish any connection between the alleged conduct of Hoey,
Rosman, and Green in 2003, and Ifill in 2007.  Not only did their
alleged acts occur four years apart, but they also took place in
different prisons: South Woods, where Hoey, Rosman, and Green
worked, and Northern State Prison, where Ifill worked.  (Pl.'s
Dep. Tr. 35:9-12, Pl.'s Ex. B.)

     With regard to the "frequency" of the acts, the claims
appear isolated and infrequent in nature.  Hoey, Rosman, and
Green allegedly denied Plaintiff's requests to be retested for
Lupus at specific times in January and March of 2003.  In early
2003, Hoey and Rosman allegedly failed to advise Plaintiff of the
potential side effects of prednisone, although this problem was
remedied in March 2003, when the Rheumatologists informed him of
these risks.  Approximately four years later, Ifill allegedly
convinced Plaintiff's doctor to deny him pain medication during a
two-week period in May and June 2007.  Even if the first two
claims recurred between January and March 2003, they ceased
occurring after March 2003, and have no connection to the 2007
claim against Ifill.

     Turning to the third Cowell factor, each of Plaintiff's
claims carried a degree of permanence, which should have
triggered Plaintiff's awareness of his rights and his duty to

assert those rights.  Defendants Hoey and Rosman's alleged
failure to warn Plaintiff of side effects associated with
prednisone became permanent in March 2003, when the
Rheumatologists informed Plaintiff of these potential adverse
effects and Plaintiff became aware of the risk he had faced
during his prior two-month treatment with prednisone.  Similarly,
Plaintiff was well aware that he had been wronged when defendants
Hoey, Rosman, and Green allegedly denied his requests for
retesting in January and March of 2003.  Plaintiff testified that
he received information from the National Lupus Foundation in
March 2003, which informed him that Lupus is very rare among
African American men and that mental health medications can
distort Lupus test results.  See, supra, Part I.  This caused him
to seriously doubt his Lupus diagnosis and to request retesting
from three different health care providers at two different
times.  The Court finds it unlikely that Plaintiff was oblivious
to the wrongfulness of these denials, particularly since
Plaintiff believed he was being treated for a disease he did not
have and that his true illness evaded detection and treatment.
Thus, he should have brought his claim within the applicable
limitations period.  Excusing Plaintiff's failure to raise these
claims in a timely manner would violate the fundamental policy
rationale behind the statute of limitations.  Cowell, 263 F.3d at
295 ("[T]he continuing violations doctrine should not provide a

means for relieving plaintiffs from their duty to exercise
reasonable diligence in pursuing their claims. . . .  Limitations
periods are intended to put defendants on notice of adverse
claims and to prevent plaintiffs from sleeping on their rights.")
(citations and quotations omitted).

Plaintiff argues that his claims only became permanent when
he tested negative for Lupus in 2006, because this was the point
at which he finally realized "he had suffered tremendous pain and
physical harm as a result of taking a medication for a disease he
did not have." (Pl.'s Opp. Br. 16.)  However, Plaintiff casts
doubt on this self-serving claim by acknowledging that he
continued taking prednisone for three more years after this
alleged "realization." See, supra, Part I.  He casts even
further doubt on this claim by stating that he suspected "all
along" that he did not have Lupus. (Pl.'s SDMF to CMS ¶ 24.)  In
light of Plaintiff's inconsistent statements, which are not
supported by the record, the Court rejects this argument.

In any event, the fact that Plaintiff tested negative for
Lupus during the statutory period does not permit him to
resurrect his claims under the continuing violations doctrine.
"The focus of the continuing violations doctrine is on
affirmative acts of the defendants." Cowell, 263 F.3d at 293
(finding that mere existence of municipal liens did not amount to
continuing violation and township's refusal to remove such liens

was not "affirmative act") (internal citations omitted) (emphasis added).  In other words, a "continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation."  Id. at 293 (quoting Ocean Acres Ltd. v. Dare Cnty. Bd. of Health, 707 F.2d 103, 106 (4th Cir. 1983) (quotations omitted)).  The mere fact that Plaintiff discovered he may not have Lupus from a test conducted by Dr. Godinsky, who is not a defendant in this action, does not constitute an affirmative act by Hoey, Rosman, or Green.  Accordingly, the alleged conduct does not amount to a continuing violation.[19]

Similarly, the claim against St. Francis for failing to warn or follow-up with Plaintiff to ensure he was adequately handling the prednisone is also time-barred.  The Court rejects Plaintiff's continuing violation theory in this context as well, since St. Francis' last affirmative act occurred on the day Plaintiff was discharged from St. Francis in January 2003, more than four years before Plaintiff filed the original complaint in this matter.  Moreover, Plaintiff even testified that during his stay at St. Francis, he believed he had been misdiagnosed and thus, had requested retesting.  It is therefore clear from the record that Plaintiff was aware of St. Francis' allegedly wrongful conduct before his discharge.

---

[19] Plaintiff has not argued any other theory of equitable tolling other than the continuing violation doctrine.  Even if Plaintiff had argued another theory, the Court need not reach this issue, given his failure to exhaust his administrative remedies prior to filing suit and failure to establish his claims under the Eighth Amendment.

### C.   The Merits

In an abundance of caution, the Court notes that even if the PLRA's exhaustion requirement and the statute of limitations did not bar this suit, Plaintiff's claims would not survive summary judgment because they do not amount to constitutional torts. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State...subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Therefore, to succeed on his claims, Plaintiff must establish two elements: (1) "the violation of a right secured by the Constitution and laws of the United States" and (2) "that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).  The CMS Defendants do not dispute that they were acting under color of state law when they provided medical services to Plaintiff.[20]

"As in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998) (citation omitted).  The Eighth Amendment ban on cruel

---

[20] Although St. Francis contends that it was not a state actor when it provided medical care to Plaintiff, the Court need not reach this issue, because it denies Plaintiff's claims against St. Francis on other grounds.

and unusual punishment protects an inmate's rights to adequate medical care.  See Estelle v. Gamble, 429 U.S. 97, 103-05 (1976). To establish a violation of this right, an inmate must show a "serious medical need" and behavior on the part of prison officials that constitutes "deliberate indifference" to that need.  Estelle, 429 U.S. at 106; see also Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).

To satisfy the first prong of the Estelle inquiry, the plaintiff must demonstrate that his medical needs are serious. "Because society does not expect prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"  Hudson v. McMillan, 503 U.S. 1, 9 (1992) (citing Estelle, 429 U.S. at 103-04).  The Third Circuit has defined a serious medical need as: (1) "one that has been diagnosed by a physician as requiring treatment;" (2) "one that is so obvious that a lay person would recognize the necessity for a doctor's attention;" or (3) one for which "the denial of treatment would result in the unnecessary and wanton infliction of pain" or "a life-long handicap or permanent loss."  Atkinson v. Taylor, 316 F.3d 257, 272-73 (3d Cir. 2003) (internal quotations and citations omitted); see also Monmouth Cnty. Corr. Institutional Inmates, 834 F.2d 326, 347 (3d Cir. 1987).

The second element of the Estelle test requires an inmate to

31

show that prison officials acted with "deliberate indifference" to his serious medical need.  See Natale, 318 F.3d at 582. "Deliberate indifference" requires more than negligence or medical malpractice.  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999); see also White v. Napoleon, 897 F.2d 103, 108 (3d Cir. 1990).  Rather, it is a "subjective standard of liability consistent with recklessness as that term is defined in criminal law." Natale, 318 F.3d at 582 (citing Nicini v. Morra, 212 F.3d 798, 811 (3d Cir. 2000)).  A prison official acts with "deliberate indifference" when "the official 'knows of and disregards an excessive risk to inmate health or safety.'" Id. (citing Farmer v. Brennan, 511 U.S. 825, 837-38 (1994)).  Thus, to survive summary judgment, Plaintiff must point to some evidence that the defendants knew of a substantial risk of harm to him and failed to act despite that knowledge.  Id.

The Third Circuit has found deliberate indifference where a prison official: (1) "knows of a prisoner's need for medical treatment but intentionally refuses to provide it;" (2) delays necessary medical treatment for non-medical reasons; (3) "prevents a prisoner from receiving needed or recommended treatment"; or (4) "persists in a particular course of treatment in the face of resultant pain and risk of permanent injury." See Rouse, 182 F.3d at 197 (internal citations and quotations omitted).  The Third Circuit also has held that "[n]eedless

32

suffering resulting from a denial of simple medical care, which does not serve any penological purpose," violates the Eighth Amendment.  <u>Atkinson</u>, 316 F.3d at 266; <u>see also</u> <u>Monmouth Cnty. Corr. Institutional Inmates</u>, 834 F.2d at 346; <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 67 (3d Cir. 1993).

However, the "deliberate indifference" standard affords considerable deference to prison doctors.  <u>Inmates of Allegheny Cnty. Jail v. Pierce</u>, 612 F.2d 754, 762 (3d Cir. 1979).  Courts will not "second-guess" the propriety of a particular course of treatment if it is a question of sound professional judgment.  <u>Id.</u>  Thus, "mere disagreements over medical judgment do not state Eighth Amendment claims."  <u>White</u>, 897 F.2d at 110 (internal quotations and citations omitted).  Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, that would amount to medical malpractice and not an Eighth Amendment violation.  <u>See</u> <u>White</u>, 897 F.2d at 110; <u>see also</u> <u>Estelle</u>, 429 U.S. at 105-06.  Accordingly, a "misdiagnosis or preference for a certain type of treatment will not alone rise to the level of deliberate indifference."  <u>Christy v. Robinson</u>, 216 F. Supp. 2d 398, 413 (D.N.J. 2002) (citations omitted).  Against this backdrop, the Court considers each claim in turn.

      1.    **Plaintiff's claim that Hoey, Rosman, and Green failed to retest him for Lupus**

33

Plaintiff claims that defendants Hoey, Rosman, and Green failed to retest him for Lupus despite his repeated requests.  He relies exclusively on his own deposition testimony and does not cite to his extensive medical records, 84 health service request forms or 29 prison grievances for support.  Assuming Plaintiff's unsupported testimony is true, at most, the failure to retest Plaintiff for Lupus amounts to negligence, which is not cognizable under § 1983.[21]

The Supreme Court has long held that the question of whether "additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." Estelle, 429 U.S. at 107.  Under the deliberate indifference standard, prison medical authorities have "considerable latitude" in exercising this judgment in the diagnosis and treatment of inmate patients.  Inmates of Allegheny Cnty. Jail, 612 F.2d at 762.  In fact, "[c]ourts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment which remains a question of sound professional judgment." Id. (internal punctuation and citation omitted).  Thus, a medical decision not to order another test, "X-ray, or like measures, does not represent cruel and unusual punishment.  At most, it is

---

[21] In fact, it is unclear that this conduct even amounted to negligence.  The record suggests that Dr. Hoey believed retesting was medically unnecessary, since a specialist in rheumatology was treating Plaintiff.  In a letter brief to the Court, Plaintiff asserted that he requested retesting from Dr. Hoey, who allegedly responded, "I would imagine the testing that was done is pretty good and retesting will probably show the same thing.  But I will order a consult for you to go to a Rheumatologist who [is a] Lupus Specialist."

medical malpractice, and as such the proper forum is the state court under the [New Jersey] Tort Claims Act." Estelle, 429 U.S. at 107.  Accordingly, although Plaintiff wanted to be re-tested for Lupus, the decision to deny this request was a matter of medical judgment and does not amount to cruel and unusual punishment.  See id.; Jetter v. Beard, 130 Fed. Appx. 523, 526 (3d Cir. 2005), cert. den'd, 546 U.S. 985 (2005) (noting that while plaintiff would have preferred a different course of treatment, his preference does not establish an Eighth Amendment cause of action); Pilkey v. Lappin, Civ. Action No. 05-5418, 2006 WL 1797756, *2 (D.N.J. June 26, 2006) (noting that "refusal to consider inmate's self-diagnoses," or "to perform tests or procedures that the inmate desires" does not amount to cruel and unusual punishment).[22]

### 2.   Plaintiff's claim that Hoey and Rosman failed to warn him of the side effects of prednisone

The Court now turns to Plaintiff's second allegation. Although Plaintiff's statement of material disputed facts represents that Doctors Hoey and Rosman failed to warn him of

---

(Pl.'s Ltr. Br. at "b", Sept. 19, 2007, Dkt. Ent. 8-1.)

[22] Furthermore, even assuming that Plaintiff had been retested and tested negative for Lupus in 2003, the record suggests that this test result would not have affected his treatment with prednisone anyway, because he continued taking prednisone for three years after testing negative for Lupus in 2006. See, supra, Part I.  Thus, it is unclear how this earlier retesting would have affected Plaintiff's decision to take prednisone anyway.  This fact calls into question whether Plaintiff's desire for retesting constituted a serious medical need for 1983 purposes.  See, e.g., Maldonado v. Terhune, 28 F. Supp. 2d 284, 289-90 (D.N.J. 1998) (noting that in determining whether a medical need was serious, a court should consider whether any harm actually resulted from the lack of medical attention) (citation omitted).

prednisone's side effects, it is important to note that not only
does the Complaint fail to allege such a claim, but the portion
of Plaintiff's deposition transcript on which Plaintiff relies
for this fact does not even convey such a claim.  (Pl's Suppl.
SDMF ¶ 17 (citing Pl.'s Dep. Tr. 65:20-66:14, Pl.'s Ex. B).)  The
deposition transcript actually reflects that only nurse
practitioner Lisa Renee Kuntz failed to inform Plaintiff of
prednisone's potential side effects.  (Pl's Dep. Tr. 66:2-14,
Oct. 22, 2010, Pl.'s Ex. B.)  Kuntz is a named defendant in this
action but has not appeared.[23]  Since Plaintiff has not cited to

---

[23] Importantly, the docket reflects that Plaintiff never served defendant
Kuntz.  After Plaintiff filed the original complaint pro se, the Court ordered
the Clerk of Court to issue summonses and directed the U.S. Marshal to serve
these summonses and copies of the complaint on all defendants.  [Dkt. Ent. 6.]
The summons to Green, Hoey, Rosman, and Kuntz were each returned unexecuted.
The summons for Kuntz was delivered to Riverfront State Prison and returned
with the handwritten note:  "This individual is not employed at this
facility."  [Dkt. Ent. 13.]  Plaintiff subsequently filed two motions
requesting that the Court issue new summonses.  [Dkt. Ent. 19, 31.]  The Court
heard oral argument on these motions as well as several other motions on
February 28, 2008.  [Dkt. Ents. 64, 114.]  During oral argument, Plaintiff
clarified that he only wanted new summonses issued to the two defendants that
he wished to add in an amended complaint (Iffel and Dr. Hochberg).  [Hearing
Transcript, Feb. 28, 2008, 23:3-10, Dkt. Ent. 114.]  The Court granted this
request as well as Plaintiff's request for pro bono counsel.  [Dkt. Ents. 62,
114.]  Plaintiff's pro bono counsel subsequently filed requests for summonses
with respect to Hoey, Green, Rosman, and Ifill on January 9, 2009.  [Dkt.
Ents. 101-04.]  Those summonses were issued the following week.  [Dkt. Ent.
105.]  Since Plaintiff never served Kuntz, even after obtaining pro bono
counsel, and the 120-day statutory period to serve her has long since passed,
see Federal Rule of Civil Procedure 4(m), the Court must dismiss the claims
against her without prejudice.  Nonetheless, the Court notes that even
assuming Plaintiff had properly served Kuntz, his claims against her would
fail for the same reasons that the claims against the individual CMS
Defendants do not survive summary judgment.  Plaintiff's only allegation
against Kuntz is that she denied his request to retest him for Lupus in
February 2003.  (Compl. ¶ 17(e).)  This claim is not only time-barred, see,
supra, Part III.B, but also fails under the PLRA's exhaustion requirement,
because Plaintiff did not file any grievances with respect to this claim, see,
supra, Part III.A.  Finally, it would fail on the merits, because it does not
amount to a constitutional violation under the Eighth Amendment.  See, supra,
Part III.C.1.  Although the Complaint does not allege a claim against Kuntz

any allegation in the Complaint or evidence in the record to support his claim, it fails as a matter of law.  S.E.C. v. J.W. Barclay & Co., 442 F.3d 834, 840 (3d Cir. 2006) (mere allegations are not enough to survive summary judgment).

Even assuming Plaintiff had properly alleged this claim, however, he has not established that defendants Hoey and Rosman acted with deliberate indifference.  Plaintiff's allegations do not suggest reckless disregard with respect to the care that Plaintiff received; nor do they show the requisite intent to harm Plaintiff.  In fact, the record shows that Plaintiff received care for his medical conditions regularly, that he was referred to specialists in rheumatology, and that he was given multiple medications to treat his pain.  See, supra, Part I.  Plaintiff even admits that he was referred to the Rheumatologists in March 2003, who advised him of the potential side effects of prednisone.  At most, Hoey and Rosman's conduct amounts to negligence or medical malpractice, which is not actionable under the Eighth Amendment.  See Jetter, 130 Fed. Appx. at 526 (holding that prison doctor's failure to inform plaintiff of side effects of Prednisone "amounts to nothing more than negligence") (citing Estelle for the proposition that mere negligence or inadvertence will not satisfy the deliberate indifference standard); Douglas

---

for failing to advise Plaintiff of the side effects of prednisone, such a claim would also constitute, at most, negligence and is thus not cognizable under § 1983. See, supra, Part III.C.2.

v. Perez, Civ. Action No. 06-4175, 2007 WL 203945, *4 (D.N.J.
Jan. 23, 2007) (dismissing § 1983 claim that prison doctor failed
to inform plaintiff of side effects of Prozac, because it
amounted to nothing more than negligence).

### 3. Plaintiff's claims against St. Francis

The Court notes that Plaintiff has not sued any individuals
who treated him at St. Francis.  To the extent that he attempts
to hold St. Francis vicariously liable under § 1983 for the
alleged wrongful conduct of its employees, such claims fail as a
matter of law.  See Montgomery v. De Simone, 159 F.3d 120, 126
(3d Cir. 1998) (citing Monell v. Dep't of Soc. Servs. of City of
N.Y., 436 U.S. 658, 691-94 (1978)) ("Under 42 U.S.C. § 1983,
municipal defendants cannot be held liable under a theory of
respondeat superior; municipal liability only arises when a
constitutional deprivation results from an official custom or
policy.").  Even assuming St. Francis was a state actor, see
supra n.20, it may only be held liable to the extent that its
policy or custom caused the constitutional violation alleged.
See infra.

The Court notes, however, that even if Plaintiff had
properly asserted these claims against the individuals who
treated him at St. Francis, they would not survive summary
judgment anyway.  Plaintiff has not shown that the doctors at St.
Francis acted with reckless disregard to his health by failing to

38

advise him of the side effects of prednisone or monitor his condition after his discharge.  At most, such mistakes constitute negligence, which is not actionable under the Eighth Amendment. See Estelle, 429 U.S. at 107.  In fact, the record reflects that Plaintiff's treating physicians at St. Francis did attempt to follow up with him.  The discharge summary from St. Francis recommends his referral to Dr. Carney, the rheumatologist who diagnosed him, "within one week to find out how long the patient should be on prednisone." (Pl.'s Ex. E at 3.)  The record suggests that Plaintiff's physicians at CMS were then responsible for scheduling Plaintiff's rheumatology consult, and in fact, they did schedule such a consult, although not with Dr. Carney. See, supra, n.21, Part I.  Thus, there is no evidence to suggest that St. Francis' employees acted wantonly or with reckless disregard to Plaintiff's health.

### 4.  Plaintiff's claim against Ifill

Turning to Plaintiff's final claim that Nurse Ifill told Dr. Hochberg to stop Plaintiff's pain medication, it appears Plaintiff merely presumed she had done this based on the fact that Dr. Hochberg allegedly told him that other prisoners with avascular necrosis were not in as much pain as Plaintiff. (Pl.'s Dep. Tr. 35:20-25, Pl.'s Ex. B to CMS.)  Plaintiff claims that as a direct result of this, he did not receive pain medication from May 22 to June 5, 2007. (Id. at 55:13-21.)

Plaintiff has failed to point to any evidence in the record to support his allegation that Dr. Hochberg denied him pain medication other than his own deposition testimony.  In fact, the record reflects that Dr. Hochberg did prescribe him pain medication during this period.  He gave Plaintiff Toradol for left shoulder pain on May 23, 2007, after which Plaintiff was transferred to Riverfront State Prison.  See, supra, Part I. Furthermore, Plaintiff's assumption that Ifill caused the alleged denial of pain medication is pure speculation.  Plaintiff has not pointed to any facts in the record to support this inference. Indeed, Ifill testified that she did not have the authority to make such a determination, and Plaintiff's medical records reflect that she was not involved in Plaintiff's treatment during this time period.  See id.  Since Plaintiff has failed to point to any evidence other than mere speculation to support his claim against Ifill, he has not established an Eighth Amendment claim against her.  See Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010), cert. den'd, 131 S. Ct. 458 (2010) ("[S]peculation and conjecture may not defeat summary judgment.") (citing Acumed LLC v. Advanced Surgical Servs., 561 F.3d 199, 228 (3d Cir. 2009)). Thus, even viewing the evidence in a light most favorable to Plaintiff, no reasonable jury could conclude that Ifill acted with reckless disregard to Plaintiff's serious medical needs.

### D.   Custom, Policy, or Practice

Plaintiff has not established his claims against CMS, the individual CMS Defendants in their official capacity, or St. Francis.  As discussed above, a municipal entity is not liable under § 1983 for the conduct of its employees on a theory of respondeat superior.  See Montgomery, 159 F.3d at 126 (citing Monell, 436 U.S. at 691-94).  Rather, to sustain a § 1983 claim against a corporate entity Plaintiff "must provide evidence that there was a relevant . . . policy or custom, and that the policy caused the constitutional violation" alleged.  Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (citing Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 404 (1997)).  "'Policy' includes official proclamations made by a municipal decisionmaker with final authority, and 'custom' is defined as 'practices of state officials . . . so permanent and well settled as to virtually constitute law.'"  Kelly v. Borough of Carlisle, 622 F.3d 248, 263 (3d Cir. 2010) (quoting Berg v. Cnty. of Allegheny, 219 F.3d 261, 275 (3d Cir. 2000)).

There are three situations where a government employee's act constitutes a "policy" or "custom", thus giving rise to municipal liability under § 1983:

> The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy.  The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.  Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the

41

> agents of the government is so obvious, and the
> inadequacy of existing practice so likely to result in
> the violation of constitutional rights, that the
> policymaker can reasonably be said to have been
> deliberately indifferent to the need.

Natale, 318 F.3d at 584 (internal citations and punctuation

omitted).  In each of these scenarios, the plaintiff must also

"demonstrate that, through its *deliberate* conduct, the

municipality was the 'moving force' behind the injury alleged."

Brian Cnty., 520 U.S. at 404 (emphasis in original) (citing

Monell, 436 U.S. at 694).  Thus, "a plaintiff must show that the

municipal action was taken with the requisite degree of

culpability and must demonstrate a direct causal link between the

municipal action and the deprivation of federal rights."  Id.

Plaintiff argues that CMS and St. Francis fall into the third

category of municipal liability, because they failed to

affirmatively act despite an obvious need to do so to protect the

constitutional rights of inmates.

The Complaint alleges that CMS established a "policy and

practice of deliberate indifference by refusing treatment,

appointments, and medication to Frierson and others who needed

said treatment."  (Compl. ¶ 14.)  Plaintiff has failed to cite to

any facts or evidence to establish the existence of such a

"policy and practice."  In fact, the record belies such a claim.

Plaintiff received numerous treatments and was prescribed

multiple medications for his various ailments; he was also seen

many times by general practitioners and specialists.  See, supra,
Part I.  In light of this record, it appears Plaintiff attempts
to re-characterize his allegations in his opposition papers.
Specifically, he now claims that CMS failed to institute policies
that: (1) ensured adequate access to diagnostic testing, (2)
mandated that inmates be advised of the side effects of
medication given to them, and (3) provided a manner of ensuring
that those charged with administering medication could not
contravene prescriptions by doctors.  (Pl.'s Opp. Br. to CMS 12.)
Plaintiff claims that if such policies had been in place, he
would have received an accurate diagnosis, would not have taken
unnecessary medication, and would not have endured two weeks of
needless suffering without pain medication.  (Id. at 12-13.)

     However, Plaintiff has not pointed to any facts or evidence
to suggest that the CMS Defendants' alleged conduct was part of a
generally applicable policy or custom.  Plaintiff has failed to
show that a policymaker was responsible for these alleged
treatment-deficiencies or that a policymaker failed to prevent
his injuries in the face of an obviously inadequate existing
practice.  In fact, there is no evidence that these incidents
were more than isolated acts by the individual CMS Defendants.
Thus, Plaintiff has not demonstrated that CMS' deliberate conduct
was the moving force behind his injury.

     Furthermore, since Plaintiff did not suffer an injury of

constitutional proportions, CMS may not be held liable under §
1983.  It is well settled that for liability to attach under
Monell, the municipality's policy or custom must have caused a
constitutional violation.  See Collins v. City of Harker Heights,
503 U.S. 115, 120 (1992) (holding that municipal liability
requires (1) that plaintiff's harm was caused by a constitutional
violation, and (2) that the municipality is responsible for that
violation); Startzell v. City of Philadelphia, 533 F.3d 183, 204
(3d Cir. 2008) (citing Collins) ("For § 1983 liability to attach,
[plaintiff] must show that the City was responsible for any
constitutional violations."); Brown v. Commonwealth of Pa., Dep't
of Health Emergency Med. Servs., 318 F.3d 473, 482 (3d Cir. 2003)
(citing Collins) ("[F]or there to be municipal liability, there
still must be a violation of the plaintiff's constitutional
rights.").  Because the Court has found that there was no
violation of Plaintiff's constitutional rights, the claim against
CMS cannot stand.  Id.

Similarly, Plaintiff's claims against the individual CMS
Defendants in their official capacities fail as a matter of law.
Official-capacity suits are "'another way of pleading an action
against an entity of which an officer is an agent.'"  Hafer v.
Melo, 502 U.S. 21, 25 (1991) (citing Kentucky v. Graham, 473 U.S.
159, 165 (1985) and Monell, 436 U.S. at 690 n.55).  Thus, suits
against CMS officials in their official capacities should be

treated as suits against CMS.  Accordingly, CMS' policy or custom
must have played a part in the constitutional violation.  Id.
For the reasons discussed above regarding Plaintiff's claim
against CMS, Plaintiff has failed to establish such a policy or
custom.  Furthermore, Plaintiff has not even pled facts to
suggest that the individual CMS Defendants had policymaking
authority or that they took action that could fairly be said to
constitute policy.  Accordingly, those claims must be dismissed.
See Santiago v. Warminster Tp., 629 F.3d 121, 135 (3d Cir. 2010)
(dismissing claim against township where complaint did not allege
that police chief had policymaking authority or what action he
took that amounted to policy).

     While the Complaint is not a model of clarity, it appears
Plaintiff also alleges that St. Francis had a custom, practice,
or policy of failing to monitor its patients after they were
discharged from its hospital.  The Court notes that Plaintiff has
mischaracterized the testimony of Joanne Young, St. Francis'
Director of Clinical Operations, to support this position.
According to Plaintiff, Young testified that St. Francis had no
policy for follow-up care.  Her deposition testimony reflects,
however, that follow-up care is available to patients after their
release from St. Francis, but that she could not answer
Plaintiff's specific questions regarding this care, given their

overly broad nature.[24]  Plaintiff has failed to produce any
additional evidence to show that St. Francis did not have a
policy in place for follow-up care.  Moreover, Plaintiff has
ignored the fact that St. Francis did recommend follow-up
treatment in the discharge summary it sent to CMS.  This summary,
authored by St. Francis physician Selim U. Sheikh, recommended
that Plaintiff be referred to Dr. Carney, a rheumatologist,
within one week of his discharge.  (See Pl.'s Ex. E to St.
Francis at 3.)  It appears CMS personnel subsequently arranged
for a rheumatology consult, albeit not with Dr. Carney.  See,
supra, n.21, Part I.

     Furthermore, like the claim against CMS, because Plaintiff
has not suffered a constitutional violation, he cannot establish
a claim against St. Francis for municipal liability under Monell.
See supra.

     Plaintiff cites Natale v. Camden County Correctional
Facility, 318 F.3d 575 (3d Cir. 2003) in support of his
contention that St. Francis' failure to monitor him after his
discharge was due to a custom or policy of deliberate

---

[24] Young's deposition testimony reads in relevant part:
          Q. [I]s there any type of follow-up care once they are released?
          A. Yes.
          Q. Is St. Francis involved in that follow-up care?
                    [St. Francis' counsel]: Objection to form.
          A. I can't answer that.
          Q. The doctors who are on the floor who treat the patient, are
          they involved in the follow-up care of the patient?
          Q. They could be.  I need clarification.
              [St. Francis' counsel]:  Your question is very broad and all
          encompassing.  So I think that's the issue with it.
                 [Plaintiff's counsel]:  I understand.

indifference towards the medical needs of inmates.  Plaintiff's
reliance on Natale is misplaced.  In that case, an insulin-
dependent diabetic claimed he had suffered a stroke due to the
prison health care provider's failure to administer insulin to
him during the first twenty-one hours of his incarceration.  Id.
He produced evidence that the prison health care company did not
require employees to report an inmate's serious medical
conditions to any supervisors or to see a doctor within 72 hours
of arriving in the prison.  Natale, 318 F.3d at 584-85.  Relying
on this evidence, the Third Circuit concluded that the prison
healthcare company could be found liable under Monell for failing
to establish a policy to address the immediate medication needs
of inmates with serious medical conditions.  Id. at 585.  The
Court noted that a reasonable jury could infer that the failure
to establish a more responsive policy caused the constitutional
violation alleged, i.e., the failure to administer insulin to the
plaintiff in a timely fashion.  Id.

      Here, in contrast, Plaintiff has not produced any evidence
to show that St. Francis had a custom or policy of failing to
follow-up with its patients after discharging them, or that such
a failure to monitor caused a constitutional violation.  As
discussed above, the record reflects that St. Francis did
recommend follow-up treatment in its discharge summary and that
at most its treatment of Plaintiff amounted to an isolated act of

(Young Dep. 10:1-15, Pl.'s Ex. H.)      47

negligence.  Moreover, unlike in <u>Natale</u>, the record indicates
that Plaintiff's primary care was entrusted to the medical
professionals located at South Woods, not to St. Francis, a
hospital where he was admitted for only a matter of days in 2003.

Accordingly, Plaintiff's municipal liability claims cannot
survive summary judgment.

## IV. PLAINTIFF'S MOTION FOR THE COURT TO RE-ENTER A PRIOR ORDER

Plaintiff urges the Court to re-enter its prior Order
granting dismissal with prejudice to the defendants "New Jersey
Department of Corrections and Department Officials" in order for
Plaintiff to timely appeal this dismissal.  [Dkt. Ent. 174.]  The
Court notes, however, that Plaintiff has never named the New
Jersey Department of Corrections or "Department Officials" as
defendants in this matter.  In fact, a review of all three
complaints shows that Plaintiff never alleged claims against such
defendants.  It appears Plaintiff may be referring to George W.
Hayman, Commissioner of the Department of Corrections, who was
sued in his individual and official capacities in the Amended
Complaint.  [Dkt. Ent. 88.]  Hayman was the only defendant who
was named in any of the complaints that was subsequently
dismissed from this case.  In the Second Amended Complaint, filed
on July 8, 2009, Plaintiff dropped his claims against Hayman.
[Dkt. Ent. 123.]  Counsel for Plaintiff and Hayman subsequently
filed a joint stipulation of dismissal on September 17, 2009,

which dismissed with prejudice all claims against Hayman.  [Dkt. Ent. 130.]  Thus, Plaintiff is mistaken in his belief that the Court dismissed Hayman from this action.  In fact, Plaintiff himself stipulated to this dismissal.  Accordingly, the Court rejects Plaintiff's request that the Court re-enter such an order.

## V. CONCLUSION

For the reasons stated herein, both motions for summary judgment will be granted.  Plaintiff's motion for reinstatement of a prior order will be denied.  An appropriate Order will issue herewith.

Dated: <u>August 4, 2011</u>                    <u>s/Renée Marie Bumb</u>
                                       RENÉE MARIE BUMB
                                       UNITED STATES DISTRICT JUDGE